# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | 3:06-0593 |
| v. | ) ) | Judge John T. Nixon |
| CARLOTA FREEMEN, | ) ) | |
| Intervenor Plaintiff, | ) ) | |
| v. | ) ) | |
| WHIRLPOOL CORPORATION, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER

This is a Title VII and 42 U.S.C. § 1981 action for race and sex harassment brought against Whirlpool Corporation ("Whirlpool" or "Defendant") by Plaintiff Equal Employment Opportunity Commission ("EEOC") and Intervening Plaintiff Carlota Freeman ("Freeman") (collectively, "Plaintiffs"). A bench trial was held in this Court on February 24-27, 2009. Each party submitted their proposed findings of fact and conclusions of law on April 17, 2009 (Doc. Nos. 179, 180, & 184). Also pending is Defendant's Motion for Judgment on Partial Findings ("Defendant's Motion") (Doc. No. 164), to which the EEOC and Freeman submitted responses (Doc. Nos. 178 & 181). Defendant offered that Motion at the close of Plaintiffs' proof, at which time the Court deferred a ruling on that Motion. The Court will make its findings of fact and

Case 3:06-cv-00593   Document 194   Filed 12/21/09   Page 1 of 31 PageID #: 3431

conclusions of law on the entire record submitted, therefore the Court **DENIES** Defendant's

Motion.  For the reasons below, the Court finds that Plaintiffs have met their burden of

persuasion and therefore **ENTERS JUDGMENT** in favor of Plaintiffs.

**I.     FINDINGS OF FACT**

Plaintiff Carlotta Freeman, an African-American woman, began work at the Whirlpool

Corporation's LaVergne, Tennessee facility in December 1989.  In January 2004, Freeman was

working on Line 4 in the room air conditioner department.  Also in January 2004, Willie Baker,

a white man, was transferred to Line 4.  Freeman and Baker worked in relatively close proximity

to each other on the assembly line.  Kim Wheeler, a white woman, was group leader of Line 4, a

position without managerial duties but responsible for covering for other employees when they

went to the restroom and making sure that the line ran smoothly.  Chinica Lillard, an African-

American woman, also worked on Line 4.  Charles "Charlie" Fisher was the Manufacturing

Supervisor directly responsible for Line 4.  Manufacturing Supervisor Jimmy Lovelace was

Fisher's boss.  Curt Gamauf was Human Resources Manager for the LaVergne Division.

Employees received two ten minute breaks and one thirty minute lunch break per shift.

Freeman and Wheeler usually went outside to the same break area to smoke and talk together.

After starting work on Line 4, Baker began taking his breaks in the same area and talking with

Freeman and Wheeler during those breaks.  Generally sociable, Freeman was initially friendly

with Baker.  However, Freeman testified that Baker began staring at her, making her feel

uncomfortable, from the very first day they worked together.  Within a few days Baker began

making inappropriate sexual and racial comments to Freeman during breaks.  Baker, who

described himself as "a big flirt," began interrupting break time conversations between Freeman

-2-

and Wheeler. Baker would sing songs to Carlotta, about "my sweet Carolina" or "my Carolina in the morning," directing them at Freeman by stating: "Carlotta, I wake up every morning and I sing this song about you." Wheeler testified that she heard Baker sing these songs and that initially Freeman rolled her eyes at Baker and his singing. Wheeler also testified that eventually Freeman made it clear to Baker, by ignoring him and then moving away from him in the break area, that she did not want to be friends with him.

Undeterred, over the next two months Baker made sexually-explicit and racially-charged statements to Freeman. These statements included: discussion of the anatomies of black versus white men; graphic detail of black versus white men's variable bedroom skills; asking if she had ever been with a white man; Freeman's likelihood of changing her mind about black men once she had sex with Baker; that Baker had never been with a black woman before; that he had dreamed about her that night; and that she was his girlfriend. Baker also made repeated comments about Freeman's appearance and clothes, including: "You know you're pretty?"; that she had a cute little body; that she looked good; that she had on a pretty thong; and did she wear thongs all the time. Baker also frequently sang songs to Freeman, with lyrics such as "fuck you when I wake up every morning and I sing this song about you," in addition to the "Sweet Caroline" songs. Freeman testified that Baker made these comments "day in and day out," both on the line and on breaks. Freeman told Baker to "leave me alone."

Freeman repeatedly complained to her direct supervisor, Charlie Fisher, about Baker's comments and behavior, including his staring. This went on for a period of two months. Fisher would assure Freeman that he would do something about Baker's behavior and suggested that Freeman ignore Baker. However, Fisher did nothing to investigate Freeman's allegations and

did not discuss them with Baker or confront him in any way.

On March 19, Baker swore at Fisher while he was directing work on the assembly line, for which Fisher verbally reprimanded Baker. That same day, while driving home from work, Fisher witnessed Baker and an African-American employee, Tim Swader, in a heated argument that resulted in police intervention at a gas station near work. Fisher called the Human Resources Manager, Curt Gamauf, and left a message about both those incidents. Gamauf did not return Fisher's phone call.

The following Monday, March 22, Baker used racial slurs while on the Line, directing comments such as "I'm tired of you niggers" and "I'm killing you black motherfuckers" at Freeman and her co-worker Lillard. Freeman felt threatened and reported Baker's comments to Kim Wheeler, who reported the same to Fisher. Fisher called Baker, Freeman, and Lillard separately into his office to discuss the matter. Manufacturing Supervisor Jimmy Lovelace and union steward Richard Eskildsen were also present at these meetings. Baker reported feeling threatened by his co-workers on the Line and asked to be moved to another area. Freeman reported that Baker harassed her and that she felt threatened when he stared at her and mumbled. Fisher told Baker and Freeman to ignore the other and not talk except if necessary. Lillard was reprimanded for using her cell phone on the Line. Despite this warning, when Fisher saw Freeman and Baker both go to the break area at the same time directly after the meeting, Fisher did not follow-up to make sure that the two were not having any contact. In fact, Fisher lied and told Lovelace that he had seen the two talking and laughing at that break.

Instead, during the break Baker walked up to Freeman and tried to talk with her. When she told him they weren't supposed to be talking, he became angry and then sang the profanity-

laced song to her. Freeman walked away from him. On her way back into the factory, Freeman

saw Fisher and reported the continuing conduct. Fisher responded, "Why don't you just go

ahead and fuck him and get it over with? Then maybe he would leave you alone." Freeman was

very upset by this remark.

Baker's harassment of Freeman continued throughout the week, and Freeman continued

to complain about that harassment to Fisher. Although Fisher called Gamauf to report his

meetings with Baker, Freeman and Lillard, Gamauf did not involve himself in the situation.

Fisher told Gamauf that Baker and Freeman had reconciled.

Baker also reported to Fisher that he felt harassed by his co-workers and that if Fisher

didn't do something about it he was afraid that someone would get hurt and he, Baker, would

lose his job. Fisher assured Baker that he would take care of the situation; however, Fisher did

nothing to address Baker's concerns. On Friday, March 26, Baker told the Director of Human

Resources, Fred Contreras, that he felt threatened by Freeman and that he had already reported

this to Fisher. Contreras did not believe that Freeman was threatening to Baker, but thought that

Baker could be the target of co-worker harassment of some kind. He called Gamauf to look into

the situation.

Later that day, when he returned to the Line from a restroom break, Baker walked up to

Freeman and punched her in the face. The blow knocked Freeman onto the assembly line, where

she was hit by air conditioners coming down the line. Baker continued to try to punch Freeman

as Lillard pulled her over the Line. Lillard got Freeman to the floor on the other side of the Line,

at which point Baker picked up a steel valve and threw it at the two women, yelling, "I'm going

to get you too," at Lillard. Fisher and Lovelace responded to the scene. Freeman was taken to

the first aid office. Lovelace took Baker to Gamauf's office, where Baker said that Kim Wheeler told him that Freeman had a gun, and so he hit Freeman. Gamauf suspended Baker after that meeting and told him to leave the plant before the police arrived. After an investigation, Gamauf terminated Baker for gross misconduct. Although Freeman worked the next day, she then took an open-ended leave of absence. Freeman resigned from Whirlpool, upon the advice of her psychiatrist and psychologist, in December 2004.

Formerly a cheerful, upbeat person, after the attack Freeman became increasingly withdrawn. Several medical experts testified that she has developed chronic post-traumatic stress disorder ("PTSD"). She can no longer participate in normal activities, including grocery shopping and attending church, because she has panic attacks. Freeman filed for divorce from her husband of many years because she felt that she could no longer be a good wife to him, although he did not want to separate. Friends and relatives reported Freeman's dramatic change in personality after the incidents at Whirlpool. Her daughter testified to how Freeman would wake up screaming in the middle of the night. Freeman has been receiving mental health treatment since 2004 and her doctors do not believe that she can work again or, in fact, that her condition will ever improve.

## II.   CONCLUSIONS OF LAW

Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331, 1343, and 1345.

Plaintiffs EEOC and Freeman allege that Defendant impermissibly discriminated against Freeman in violation of Title VII and 42 U.S.C. § 1981 by not responding adequately to co-worker Baker's racial and sexual harassment of Freeman, thereby creating a hostile work environment that culminated in a physical assault on Freeman. Defendants dispute the content of

-6-

the employees' interactions, the steps taken by Freeman to report those interactions, and the propriety of Defendant's response to the alleged harassment.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A Title VII violation may be established when a supervisor impermissibly discriminates against an employee on the basis of a protected characteristic. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64 (1986). A Title VII violation may occur in the absence of an economic effect on the employee when "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* To establish a prima facie case of coworker hostile work environment under Title VII, Plaintiff must show that the harassment was: (1) unwelcome; (2) based on a protected characteristic such as race or sex; (3) sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment; and (4) that the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (sexual harassment); *Bailey v. USF Holland, Inc.,* 526 F.3d 880, 885 (6th Cir. 2008) (racial harassment). Whether harassment is sufficiently severe or pervasive to establish a hostile work environment is "quintessentially a question of fact." *Hawkins*, 517 F.3d at 333 (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)).

Courts must examine the totality of the circumstances to determine whether or not a

-7-

hostile work environment exists.  *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993).  Factors

that may be considered when assessing the circumstances of a potential hostile work

environment include: (1) the frequency of the harassing conduct; (2) the severity of the harassing

conduct; (3) whether the conduct is physically threatening or humiliating or merely an offensive

utterance; and (4) whether the conduct unreasonably interferes with an employee's work

performance.  *Id.*

        The factfinder evaluates the harassing conduct by both an objective and a subjective

standard: "[t]his requires a plaintiff to establish both that the harassment was 'severe or

persuasive' enough to create an environment that a reasonable person would find objectively

hostile or abusive, and that he or she subjectively regarded the environment as abusive."  517

F.3d at 333; 510 U.S. at 21-22.  While psychological harm is not required to establish a hostile

work environment claim, "the effect on the employee's psychological well-being is, of course,

relevant to determining whether the plaintiff actually found the environment abusive."  510 F.3d

at 23.

**A.      Unwelcome Harassment Based on Race and Sex**

        It is undisputed that Intervening Plaintiff Carlotta Freeman is a member of a protected

group as both a woman and as an African American.  In addition, Plaintiffs have demonstrated

that Freeman was subjected to unwelcome harassment based upon her status as female and

African-American.

        The Court finds that Willie Baker subjected Freeman to an escalating campaign of racial

and sexual harassment that culminated in his physical assault on her on March 26, 2004.

Beginning in January 2004, Freeman and Baker worked together on Line 4 at Whirlpool's

-8-

LaVergne, Tennessee factory. Although Freeman was initially friendly toward Baker, Baker would stare at Freeman, making her feel uncomfortable. Within a few days Freeman made it clear to Baker that she did not wish to be friends with him or talk with him on breaks. However, he persisted in interrupting her conversations with Kim Wheeler and singing profanity-laced songs directed to her with such lyrics as: "fuck you when I wake up every morning and I sing this song about you." Baker sang songs like this to Freeman daily and made other graphic, racially-offensive and sexually-explicit comments.

According to Wheeler, Freeman tried to avoid interacting with Baker in the break area by telling him "we're trying to talk" or "leave us alone, Willie." Eventually Freeman began moving away from that break area in an attempt to avoid Baker. Baker himself testified that he continued to take smoke breaks in the same area as Freeman and Wheeler and continued to try to talk with Freeman even after he knew that she did not want to talk with him. Another worker on Line 4, Chinica Lillard, testified that Baker was constantly "hanging around" Freeman. In fact, after the March 22 meeting in which Fisher told Baker not to have any further non-work related contact with Freeman, Baker immediately began talking with Freeman in the break area, and when she told him that they were not supposed to be talking, Baker responded angrily. He then began singing one of his profanity-laced songs. Freeman immediately left the break area.

The Court finds Freeman's testimony as to the content of conversations with Baker to be credible. While many of the most graphic statements are uncorroborated, Wheeler testified to hearing Baker sing songs to Freeman and hearing him tell Freeman "you look good today" or "you sure do look good today." Wheeler also stated that she thought Baker must have a crush on Freeman by the way that he smiled at her and his tone of voice in talking with her. Both

-9-

Wheeler and Lillard agree that Baker hung around Freeman, attempting to talk with her after Freeman made it clear that she no longer wanted to talk with him. Baker denies having made any of these comments; however, the Court does not find Baker's testimony to be credible on this point. Additionally, Freeman's best friend from childhood, Delores Hancock Sparks, told the Court that Freeman reported Baker's graphic comments to her in their weekly telephone conversations.

On March 22, 2004, Baker seemed very angry and while on the line made threatening gestures at both Freeman and Lillard (also African-American), while uttering racial slurs including "you niggers" and "I'm killing you black motherfuckers." This was the first time Baker uttered racial slurs to Freeman. Group leader Wheeler corroborated that she heard Baker make comments on the line that included use of "nigger" and "black motherfucker" when the other employees in the area included Freeman and Lillard. Previous to these explicit comments, Freeman felt singled out by Baker for other race-based comments, such as that he had a grandchild by a black person, "I don't have anything against black people but I have a problem with [a black co-worker]," and by confronting black co-workers after they visited Freeman at her workstation, asking them, "Are we cool?"

On March 26, 2004, Baker returned to Line 4 from a restroom break, walked up to Freeman and punched her in the face with his fist. Freeman was knocked onto the moving assembly line. Lillard and Wheeler witnessed the attack. Baker continued to try to punch Freeman as Lillard pulled Freeman away from him across the line. After Lillard pulled Freeman across the line, as Freeman was laying on the floor, Baker picked up a steel valve and threw it at Lillard and Freeman, yelling at Lillard, "I'm going to get you too." The details of the rest of the

-10-

aftermath of the attack are somewhat confused, but the Court finds the testimony of Wheeler and Lovelace credible as to the fact that co-workers kept Freeman and Baker separated, Freeman was upset, crying and possibly waving her arms, but she did not try to attack Baker. Baker was convicted of this assault in criminal court and referred for psychiatric counseling by that court.

**B.      Sufficiently Severe to Effect the Terms or Conditions of Employment**

To qualify as affecting a "term, condition, or privilege of employment" under Title VII, the harassment must be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." 477 U.S. at 64. Teasing, off-hand comments and isolated incidents, except when extremely serious, do not rise to the level of a change in the terms and conditions of employment sufficient to constitute a hostile work environment under Title VII. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (quoting *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81 (1998)). In evaluating whether or not a hostile work environment exists, the Court must examine the totality of the circumstances surrounding the alleged harassment. 510 U.S. at 23. Factors to be considered include: (1) the frequency of the harassing conduct; (2) the severity of the harassing conduct; (3) whether the conduct is physically threatening or humiliating or merely an offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Id.* The Sixth Circuit explained: "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether–taken together–the reported incidents make out such a case." *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).

The Court determines the presence of a hostile work environment based upon both an

-11-

objective determination–was the harassment severe or pervasive enough to create an environment that a reasonable person would find objectively hostile or abusive–and a subjective determination–did the plaintiff herself regard the environment as abusive.  517 F.3d at 333; 510 U.S. at 21-22.

### 1.     The Objective Element

A reasonable person would have found that the racially-explicit sexual comments endured by Freeman, culminating in the racist language and assault, constituted a hostile work environment.

Baker frequently directed songs and explicit commentary at Freeman.  While isolated episodes of teasing or sexual comments do not rise to the level of a hostile work environment, the Court finds that Baker harassed Freeman on an almost daily basis, both during breaks and while he worked in close proximity to her on the Line.  As the months wore on, Baker's harassment became more and more threatening, as he began mumbling and pointing at Freeman and eventually assaulted her.  The Sixth Circuit has found that "sexual comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive."  517 F.3d at 333 (citing *Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998)).

Defendant must strain to assert that the quality and quantity of racially-explicit sexual comments Baker addressed to Freeman before the assault do not meet the objective standard for sexual harassment under Title VII.  And although Baker did not utter any blatantly sexual remarks on the day of the assault, the evaluation of a hostile work environment requires an inquiry into the totality of the circumstances and a clear-eyed look at all incidents of harassment, not just those with explicitly sexual content.  The Sixth Circuit has held, "we now take this

-12-

opportunity to join our sister circuits and make clear that the conduct underlying a sexual harassment claim need not be overtly sexual in nature. *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." 187 F.3d at 565. "[N]on-sexual conduct may be illegally sex-based where it evinces 'anti-female animus, and therefore could be found to have contributed significantly to the hostile environment'" if the plaintiff can show that "but for the fact of her sex, she would not have been the object of harassment." *Id.* Non-sexually explicit harassing behavior that is "directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement." *Id.* Multiple witnesses describe Baker as mumbling and staring at Freeman and her co-worker Chinica Lillard, also African-American, preceding the assault. After punching Freeman, Baker verbally threatened Lillard as well and threw a pipe at her. The Court finds that the assault was the final harassing act in a campaign of harassment that Baker targeted at Freeman because of her sex. Any reasonable person would find Freeman's working environment to be hostile and abusive.

Defendant also asserts that Baker's conduct, if it occurred at all, was not what a reasonable person would find to be race-based harassment. However, the Court finds that much of Baker's sexual harassment had racialized content, including race-specific slurs, and was addressed to Plaintiff because of her status as an African-American woman. Therefore the Court does not isolate the "racial" from "sexual" harassment here, finding instead that the sexual harassment was racial in nature under the totality of the circumstances test. Additionally, the Court finds Baker's racially-explicit sexual comments to Freeman to be race-based harassment

-13-

that would not have occurred but-for Freeman's race and objectively severe enough to qualify under Title VII. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) ("even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American").

Additionally, Freeman reports two incidents of racially-explicit harassment: (1) Baker's threatening gestures and comments like "you niggers" and "I'm killing you black motherfuckers" directed at Freeman and Lillard as they were working on Line 4 on March 22, 2004; and (2) when Freeman, Lillard, and Baker were called into Fisher's office that same day because of those remarks, Baker walked by Freeman's desk and said that if he was fired, "he was killing you black motherfuckers." Wheeler corroborates that Baker made a statement to her about "all the motherfucking niggers in here" and that she assumed that Baker was referring to Freeman and Lillard with that comment because they were the only African-American workers in the area at the time. No one but Freeman reports the second threat. Baker spoke with Wheeler about his concern that some of the African-American workers had formed a gang and that one co-worker in particular had brought a gun to the factory. Racial epithets in the workplace may "create an inference that racial animus motivated other conduct as well." 191 F.3d at 662 (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999)). Although Baker did not make a racially-explicit comment to Freeman before the assault, Baker's attack on Freeman was motivated by racial animus, as suggested by his conviction, as confided to a white co-worker, that African-American co-workers had banded together to threaten him, along with his use of racial epithets in the days just prior to the attack. These incidents are severe and meet

-14-

the objective standard for race-based harassment.

In addition, harassment that involves "an element of physical invasion" is considered to be more severe than harassing comments alone. 517 F.3d at 334. Other circuits have found single incidents of threatening conduct to be sufficiently severe to create an actionable hostile work environment on their own. *See Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998) (incident where customer pulled plaintiff's hair, grabbed her breast and placed his mouth on it sufficiently severe); *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (co-worker assaulted plaintiff by pinning her against the wall, twisting her wrist to the point that it needed surgical correction, while threatening her and calling her a "bitch" sufficiently severe). Baker's attack on Freeman, along with the racial and sexual harassment of the two months preceding it, is sufficiently severe to establish a objectively hostile work environment.

Defendant contends that Baker's assault on Freeman was motivated not by racial and sexual animus, but by his delusional belief that Freeman had a gun at work. While Baker may have been delusional, or even paranoid, the Court finds that Baker's behavior escalated in response to the only intervention by Whirlpool management in his harassment of Freeman–the March 22 meeting called by Fisher. After Freeman drew the attention of management, Baker threatened her and upon their return to work on Monday, assaulted her. The Court does not find the assault to be an isolated incident, but rather a direct response to Freeman's complaints about Baker and as such, the final incident of racial and sexual harassment.

The totality of the circumstances show Freeman to have endured an objectively hostile working environment.

## 2. The Subjective Element

-15-

The Court finds that Plaintiff subjectively perceived her work environment to be abusive and hostile. The graphic sexual comments, directed at specific parts of her body and his body, were upsetting and humiliating such that Freeman took steps to silence Baker, by first ignoring him, then telling him to leave her alone or stop, and eventually by removing herself completely from the break area. These were appropriate steps that any reasonable person might take under the circumstances, and show Plaintiff to have considered the comments unwelcome.

Defendant argues that Freeman could not have perceived Baker's conduct to be abusive because she did not report that conduct to her then-husband Jimmy Freeman. The Sixth Circuit has held that there may be many reasons that a plaintiff chooses not to report actionable sexual harassment and that "the subjective component of the prima facie case does not require that a plaintiff report a hostile work environment." 187 F.3d at 566 ("A plaintiff can be subjected to sexual harassment sufficiently severe or pervasive as to constitute a hostile environment and yet, for a number of valid reasons, not report the harassment."). Plaintiff may have had any number of reasons for not telling her husband about sexually-explicit comments made to her by another man. And although Plaintiff did not report Baker's comments to her husband, she did relate that she was being harassed to her best friend, Delores Hancock Sparks. Additionally, Freeman repeatedly complained to her supervisor, Charlie Fisher, that Baker was sexually and racially harassing her, that his comments were "out of order" and making her feel uncomfortable.

The Court finds Plaintiff's testimony as to her emotional state regarding the harassment to be credible. Plaintiff's deposition testimony was substituted for her presence at trial because she was not able psychologically to withstand the stress of appearing in this case. Evidence of psychological harm is not required to establish a hostile work environment claim; however, "the

-16-

effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." 510 F.3d at 23. The Court finds that Plaintiff has met the subjective element.

## C.     Employer Liability

Once a plaintiff has established a hostile work environment, she must establish that the employer is liable because it knew or should have known about the harassment, yet failed to take immediate and appropriate corrective action. 517 F.3d at 338. The Court finds that Whirlpool knew or should have known about Baker's harassment of Freeman and failed to take reasonable care in preventing or correcting it. *See id.*

To establish employer liability, Plaintiff must show that Defendant knew or should have known about the harassing conduct. 191 F.3d at 663. Furthermore, the Sixth Circuit concluded, "in cases such as this where harassment is pervasive, courts may impute constructive notice to an employer." *Id.* An employer may be found negligent in this context if its remedial response, even if well-intentioned, "manifests indifference or unreasonableness in light of the facts the employer knew or should have known." 517 F.3d at 338 (quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997) and applying *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758-59 (1998)).

Although Defendant disputes that Freeman reported the harassment to members of management, the Court finds that she did so on multiple occasions. On the first day that Baker began work on Line 4, Freeman reported to her direct supervisor, Manufacturing Supervisor Charlie Fisher, that Baker was staring at her. Fisher downplayed Freeman's concern, assuring her that Baker was "weird" and for her not to worry about it. Freeman repeatedly reported

-17-

Baker's sexual and racial comments to Fisher, telling him that the comments made her feel uncomfortable, that she thought "Willie's situation was racial," and that his comments were "out of order." Fisher admitted that Freeman reported Baker's singing and the fact that Baker was pointing and mumbling at her and Lillard. Fisher did not report Freeman's specific complaints up the chain of command at Human Resources. He did not investigate her allegations or discuss the situation with Baker. Fisher did not ask Freeman to submit written documentation of her complaints. Rather he told Freeman, "I'll take care of it. You know I love you," and to "just ignore" Baker.

Fisher did not confront Baker about his behavior toward Freeman until the March 22 meeting. At that meeting, Freeman also reported Baker's harassment to Manufacturing Supervisor Jimmy Lovelace, Fisher's direct supervisor, and union steward Richard Eskildsen. A visibly upset Freeman complained about Baker's sexual comments, his racial comments, his staring and threatening behavior. Fisher told Freeman to ignore Baker, that he had told Baker to leave her alone. Lovelace did not report this meeting to Human Resources.

On a separate occasion, Freeman reported Baker's sexual comments to Lovelace. Freeman testified that Lovelace did not say anything in response to her allegations. Freeman believed that by reporting Baker's conduct to Lovelace she was reporting him to Human Resources, because she believed that Lovelace worked in Human Resources.

Kim Wheeler, the Group Leader on Line 4, reported hearing Freeman complain repeatedly to Fisher about Baker's conduct. Wheeler remembers Freeman as upset and stern in these conversations, and that Freeman told Fisher, "you need to do something." Wheeler remembers Fisher's response to Freeman's complaints was usually an assurance that he would

-18-

resolve the situation, telling her "I'll handle it," "I've got this, calm down," or "I'll take care of it."  Chinica Lillard, another employee on Line 4, also remembers Freeman telling Fisher that Baker was bothering her and that Fisher needed to move Baker.

Complaints by other employees about harassment are properly included in a district court's calculus of a hostile work environment.  191 F.3d at 663.  Lillard and Wheeler repeatedly told Fisher that Baker seemed unstable and that Fisher needed to intervene on the line.  Wheeler also reported Baker's comment about all the "motherfucking niggers," as well as Baker's questions to her about gangs and the presence of guns in the factory, to Charlie Fisher, precipitating the March 22 meeting.

In fact, Baker himself reported to Fisher about his conflicts on the line with Freeman. Baker told Fisher that if Fisher did not take immediate action regarding other employees, including Freeman, whom Baker perceived as threatening him, someone might get hurt.  Baker testified that Fisher took no action, however, to address or diffuse the situation.  On March 26, the day of the assault, Baker went to Fred Contreras, Director of Human Resources, to tell him that he was having a conflict with Freeman and others on the line, that he had spoken with Fisher, and that he felt threatened.  Management at Whirlpool clearly had actual notice of Baker's harassment of Freeman and their on-going conflict.

Furthermore, Whirlpool failed to take reasonable care to end the harassment.  An employer may be found negligent under Title VII if its response to the harassment, "manifests indifference or unreasonableness in light of the facts the employer knew or should have known." 517 F.3d at 338.  Defendant bears the burden of showing reasonable efforts to prevent and correct the harassment.  191 F.3d at 664.  Whirlpool does not make that showing here.

-19-

As an initial matter, a defendant's adoption of a policy against sexual or racial harassment is not sufficient, in and of itself, to establish reasonable care on the part of an employer to prevent harassment. *See Bailey v. USF Holland*, 526 F.3d 880, 887 (6th Cir. 2008). Rather, "a harassment policy itself means nothing without enforcement." *Id.* When a policy is implemented by those who do not accept that the behavior at issue constitutes harassment, that policy will most likely not be implemented effectively. *See id.*; *Clark v. UPS, Inc.*, 400 F.3d 341, 350 (6th Cir., 2005) ("The effectiveness of an employer's sexual harassment policy depends upon the effectiveness of those who are designated to implement it."). An employer response is "generally adequate, however, if it is 'reasonably calculated to end the harassment.'" 517 F.3d at 340.

The facts show a failure of every level of management at Whirlpool, from Charlie Fisher, Baker's direct supervisor, through to the Manager and Director of Human Resources. Fisher failed to respond to Freeman's repeated complaints of harassment. For two months he assured her that he would intervene in the situation, yet he never so much as spoke with Baker about Freeman's allegations. After an incident on March 19 where Fisher reprimanded Baker for swearing at him on the Line, then witnessed an altercation at a gas station outside the plant between one African-American employee and Baker, Fisher called Kurt Gamauf, his direct supervisor and Manager of Human Resources, to report both these incidents. Gamauf did not return Fisher's phone call. The next Monday, March 22, Baker used racial slurs while working on the line and Freeman told Kim Wheeler, the Group Leader, to alert Fisher. Wheeler did so. Fisher then called Gamauf again and left another message. Fisher called Gamauf the next day and left a another message. Gamauf never contacted Fisher about any of these messages.

-20-

Fisher did intervene in the situation once. After Freeman complained about Baker's use of racial slurs, Fisher called in Freeman, Baker, and Chinica Lillard separately to meet with him, Jimmy Lovelace, and Richard Esklidsen, the union steward, in Fisher's office on March 22. Baker asked to be moved away from Line 4 because he felt that people were "kicking at him" and "making fight gestures." Fisher told Baker and Freeman not to talk to each other anymore. After the meetings, Fisher watched Baker and Freeman walk out the same door to go on break. Fisher did not follow up to see if they had any interaction at that point; however, he told Lovelace that he saw them "talking and cutting up and laughing with each other." This failure to follow-up on a clearly escalating situation manifests indifference to the harassment situation which, along with Fisher's lie to his superior about the resolution of the conflict, shows employer negligence.

In fact, when Baker and Freeman walked out into the smoking area directly after this meeting, Baker immediately approached Freeman and tried to speak with her. When Freeman told Baker that he wasn't supposed to talk to her, he angrily demanded to know who said that, then began singing a profanity-laced song to her. Directly following this incident, Freeman complained to Fisher again that Baker had sexually harassed her despite Fisher telling Baker to stay away. In response Fisher said to Freeman, "Why don't you just go ahead and fuck him and get it over with? Then maybe he would leave you alone." Wheeler corroborates this exchange, testifying that once when Freeman complained to Fisher about Baker's sexual comments, Fisher responding that Freeman "should just go ahead and give [Baker] some." Defendant argues that because Freeman and Wheeler report variations on this response, the incident did not occur. The Court finds that Freeman and Wheeler are reporting the same callous response by Fisher, which

-21-

shows a shocking lack of interest in addressing and correcting reported sexual harassment on the part of management at Whirlpool. Fisher denies having made this statement, but the Court does not find Fisher's testimony to be credible on this point.

After the March 22 meetings with Freeman and Baker, Fisher succeeded in reaching Gamauf by phone. He told Gamauf about Freeman's complaints of Baker's pointing and mumbling, his meeting with both of them, and the Baker incident at the gas station. Gamauf advised Fisher to "keep an eye on the situation" and contact him with any further developments. Gamauf did not meet with Baker or Freeman after this call; in fact, Fisher told Gamauf that the two were now on friendly terms. Management at Whirlpool did not involve themselves again in the Freeman-Baker situation until after the March 26 assault.

Neither Fisher nor any other member of Whirlpool's management took appropriate steps to address the harassment. An employer's response to harassment is generally adequate if it is "reasonably calculated to end the harassment." 517 F.3d at 340. Employer actions deemed sufficient under this standard include acting upon the first complaint by separating the parties and issuing a stern warning to the offender that harassment would not be tolerated and could result in termination, see *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999), and, again acting on the initial complaint, actively monitoring the situation, following-up with the victim, and issuing a written final warning to the offender after continued harassment. *See Blankenship*, 123 F.3d at 870-71, 874. Fisher's failure to take any steps even to investigate Freeman's complaints, his hollow assurances to both Freeman and Baker that he would "take care of" their conflicts, and Fisher's lies to his supervisors that all conflicts were resolved after the March 22 meeting were unreasonable and show indifference to a harassment situation of which he was

-22-

well aware.  Plaintiffs therefore have shown, and Defendant has not disproved, a hostile work environment.

**D.    Damages**

Plaintiffs EEOC and Freeman request back pay and front pay in an amount between $511,888 and $773,261; $300,000 in compensatory and/or punitive damages; and attorneys' fees and costs.  Plaintiffs also requested a permanent injunction and declaratory judgment in their original Complaints (Doc. Nos. 1 & 9).  However, because the workplace at issue, Defendant's LaVergne Division, closed as of August 15, 2008 and Plaintiffs did not renew their request for this relief in their post-trial papers, the Court will not now grant injunctive or declaratory relief.

Under Title VII, the Court may order reinstatement, back pay, or any other equitable relief the court deems appropriate.  *See* 42 U.S.C. § 2000e-5(g)(1).  Front pay is "simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement."  *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) (finding that front pay was not subject to the compensatory damages cap of Title VII).  Plaintiffs must also mitigate their damages, if possible, by working in the interim.  *See* 42 U.S.C. § 2000e-5 ("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.").  However, front pay is appropriate where reinstatement is not an option, due to "continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by plaintiff as a result of the discrimination."  532 U.S. at 846.

Compensatory damages for nonpecuniary losses, along with punitive damages, cannot

-23-

exceed the $300,000 statutory cap for an employer with more than five hundred (500) employees.  *See* 42 U.S.C. § 1981(b)(3).  Compensatory damages under this section do not include back pay, interest on backpay, or any other type of relief authorized under section 709(g) of the Civil Rights Act of 1964, including reinstatement or front pay.  *See id.*; 42 U.S.C. § 2000e-5.

### 1. Back pay and front pay

Plaintiffs' expert Dr. Mark Cohen estimated a total net loss in earning capacity for Freeman–wage loss plus employment benefits loss–in the amount of $511,888 for a shorter work life (though age 57.6) and in the amount of $773,261 for a longer work life (through social security retirement age).  The Sixth Circuit considers back pay "a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case."  *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1171 (6th Cir. 1996).  Furthermore, upon a finding of unlawful discrimination under Title VII, back pay "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purpose of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."  *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975).  Finally, workers compensation benefits are a collateral source that should not be deducted from back pay in a Title VII award.  90 F.3d at 1171.  The Court hereby finds that Plaintiff Freeman has successfully proven her Title VII sexual and racial harassment claims and is therefore entitled to back pay.

Front pay may be awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement.  *See* 532 U.S. at 846.  If reinstatement is not an

-24-

option, due to "continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by plaintiff as a result of the discrimination," front pay may be awarded.  *Id*.  Plaintiffs must mitigate the damages by working in the interim if possible.  *See* 42 U.S.C. § 2000e-5.

Freeman claims constructive discharge from Whirlpool in order to qualify for an award of front pay.  *See Pa. State Police v. Suders*, 542 U.S. 129, 147 n.8 (2004) ("a prevailing constructive discharge plaintiff is entitled to all damages available for formal discharge . . . including both backpay and, in fitting circumstances, frontpay").  After the assault, Whirlpool granted Freeman an open-ended leave of absence.  Several months later, Freeman voluntarily resigned her position upon the advice of her doctors.  Although Defendant challenges Plaintiffs' pleadings, stating that neither the EEOC nor Freeman pled a claim of actual or constructive discharge, the Court finds that under the liberal pleading requirement endorsed by the Supreme Court in Title VII constructive discharge cases, Freeman's assertion that the hostile work environment rendered her "unable to return to employment" sufficient as a statement of a constructive discharge claim (Doc. No. 9, at 3).  *See* 542 U.S. at 139 n.5.

To prove constructive discharge under Title VII, the plaintiff must prove a hostile work environment and also show "working conditions so intolerable that a reasonable person would have felt compelled to resign."  542 U.S. at 147.  The harassment creating such working conditions may be the result of an official company act, unofficial supervisory conduct, or co-worker conduct.  *Id.* at 148.  Employer-defendants may, in the absence of an employer-sanctioned adverse action officially changing the employee's status, assert an affirmative defense by showing: (1) defendant maintained an accessible and effective harassment reporting and

-25-

resolution policy; and (2) plaintiff unreasonably failed to make use of such policy. *Id.* at 134. Defendant raises this affirmative defense. (Doc. No. 13, at 6-7).

However, under Title VII employers have an affirmative duty: "once an employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it." 400 F.3d at 349. This means that "regardless of whether the victimized employee actively complained, prong one of the defense ensures that an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future." *Id.* The mere adoption of a policy is not sufficient, of itself, to satisfy this duty. *Id.* Rather, "[p]rong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." *Id.*

Whirlpool maintained a policy prohibiting racial and sexual harassment that was distributed to employees on a regular basis. That policy had a procedure through which an employee could bring a complaint of harassment to her supervisor, department head, or the Human Resources Department. The policy required that such complaints be investigated promptly, thoroughly, and in a manner intended to protect the privacy of all involved. Violations of the anti-harassment policy would result in discipline that could include termination.

As discussed above, Freeman repeatedly complained about Baker's harassment to her supervisor, Charlie Fisher, in compliance with the policy. Defendant clearly knew about the harassing behavior and therefore had an affirmative duty to correct or prevent the harassment. However, Defendant did not take reasonable care to prevent or correct the harassing behavior. Freeman complained to Fisher for two months before Fisher confronted Baker about his

-26-

behavior. That confrontation, the March 22 meeting, resulted from Baker, Wheeler, and

Freeman's reports to Fisher that there was a conflict on Line 4, that Baker had used racial slurs,

and that Baker felt threatened by his co-workers. Although Freeman complained at that meeting

about Baker's past behavior, the meeting focused on the immediate conflict. Fisher's response

to that conflict was to tell the co-workers to leave each other alone. He conducted no follow-up

on the situation, despite having witnessed Freeman and Baker walking into the same break area

immediately after the meeting. In fact, Fisher lied to his superior, telling Lovelace that he had

seen Freeman and Baker talking and laughing. It is clear that Defendant did not take reasonable

care in addressing Freeman's complaints of harassment and therefore its affirmative defense

fails.

   Once Defendant fails to prove the first prong of the affirmative defense, the Court need

not address the second prong. *See* 400 F.3d at 349. However, Defendant asserts that Freeman

failed to report this harassment to Fisher or Lovelace. As the Court noted above, it finds

Freeman's testimony credible as to her complaints. Also, Defendant asserts that Freeman

unreasonably failed to take advantage of corrective opportunities provided by her employer by

not filing a union grievance under the terms of the International Brotherhood of Boilermakers,

Iron Shipbuilders, Blacksmiths, Forgers and Helpers, Local Union No. S272, Collective

Bargaining Agreement ("CBA"). While actions by a co-worker–here Baker's harassment–are

not union-grievable, through the union grievance process a union member like Freeman could

challenge a management practice that she felt violated any part of the CBA. Although Freeman

voiced her concerns about sexual and racial harassment at the March 22 meeting of which union

steward Richard Eskildsen was a part, she did not utilize the grievance procedure with the union

regarding Fisher's failure to investigate the harassment. However, Freeman's failure to file a grievance against her supervisor does not relieve Defendant of its affirmative duty to address and end the harassment of which it was aware. Freeman complained multiple times to multiple supervisors at Whirlpool. Therefore, Defendant's affirmative defense fails at both the first and second prong.

The Court finds, for all the reasons discussed herein, that Baker's escalating harassment ending in an assault, along with Whirlpool supervisors' ineffective intervention, created working conditions so intolerable that a reasonable person would have felt compelled to resign. *See Plautz v. Potter*, 156 Fed. Appx. 812, 819 (6th Cir. 2005) ("workplace harassment that is severe and pervasive enough to create a hostile work environment may in some circumstances constructively discharge the employee"). Freeman did, in fact, resign upon the advice of two of her treating physicians who determined that her continued employment at Whirlpool would be a detriment to her mental health.

Defendant argues that Whirlpool's actions after the assault, including firing Baker, offering Freeman reassignment to a different area of the plant and different parking lot, and offering her indefinite leave show that her decision to resign was unreasonable. However, these steps were taken in response to the assault which Whirlpool maintains was not a part of Baker's harassment of Freeman, but rather spurred by his fear that Freeman was carrying a gun at work. Defendant may now claim that these actions after the assault should have assured a reasonable employee that any future harassment reported to supervisors would not escalate in a like manner; however, the Court is not persuaded. Whirlpool has never admitted that Baker's actions toward Freeman constituted harassment. Title VII is designed to spur employers to take complaints of

-28-

hostile work environment seriously and proactively investigate and end such harassment. Actions taken after harassment which, despite months of complaints, culminates in a workplace assault, likely do not inspire much confidence in reasonable current employees.

As a result of Baker's harassment and the assault, Freeman suffers from chronic post-traumatic stress disorder rendering her unable able to work. Multiple medical professionals as well as her closest friends and family attest to Freeman's severe and debilitating condition. The Court finds that reinstatement was therefore not an option, nor was any other work feasible to mitigate damages. The Court also finds the calculations of Dr. Mark Cohen as to Freeman's work life and income expectancy to be credible. Therefore, the Court **AWARDS** Plaintiff Freeman **$773,261** in front pay and back pay.

### 2. Nonpecuniary losses & punitive damages

Plaintiffs also seek $300,000 in compensatory damages for emotional injuries and/or punitive damages. Compensatory damages for nonpecuniary losses, along with punitive damages, cannot exceed the $300,000 statutory cap. *See* 42 U.S.C. § 1981(b)(3). Compensatory damages under this section do not include back pay, interest on backpay, or any other type of relief authorized under section 709(g) of the Civil Rights Act of 1964, including reinstatement. *See id.*; 42 U.S.C. § 2000e-5. Punitive damages from a Title VII claim require a showing of: (1) a malicious or reckless disregard of plaintiff's federally-protected rights; and (2) that the offending agent was acting under a managerial capacity or that his actions must be imputed to defendant under another agency rationale. *Kolstad v. American Dental Assoc.*, 527 U.S. 526, 534, 539-40 (1999). However, punitive damages will not be awarded based upon "employment decisions of managerial agents where these decisions are contrary to the employer's good faith

-29-

efforts to comply with Title VII."  *Id.* at 545 (citations omitted).

The Court finds Plaintiff Freeman's emotional injuries were caused by Defendant Whirlpool's ineffective response to her complaints of sexual and racial harassment.  The severity of her injuries, psychological and emotional, warrant an award of $300,000 in compensatory damages.

The Court will not award punitive damages.  While Freeman's supervisors, in particular Charlie Fisher, acted negligently in responding to the harassment, the Court does not find that they acted with malicious or reckless disregard of Freeman's rights.  Fisher and Freeman's other supervisors were undoubtedly aware of Defendant's anti-harassment policies, having processed a sexual harassment complaint against Baker by another female employee, as well as having attended educational seminars and periodically distributing the anti-harassment policy in the factory newsletter.  While maintaining an anti-harassment policy is not sufficient to show a good faith effort to comply with Title VII, see 526 F.3d at 887, the Court does not find that Fisher or the other supervisors acted with the requisite malicious or reckless intent for which an award of punitive damages would be warranted.  Therefore, the Court **AWARDS** Plaintiff Freeman **$300,000** in compensatory damages under Title VII.

## III.    CONCLUSION

Judgment is entered for Plaintiff Carlotta Freeman in the amount of **$1,073,261**.  The prevailing parties may move for attorney's fees and/or costs.

It is so ORDERED.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

-31-