IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Case No. 3:06-0593 |
| CARLOTA FREEMAN, ) ) | Judge Nixon |
| Intervenor Plaintiff, ) ) | |
| v. ) ) | |
| WHIRLPOOL CORPORATION, ) ) | |
| Defendant. ) | |

## ORDER

Pending before the Court is Defendant Whirlpool Corporation's ("Defendant" or "Whirlpool") Rule 59 Motion to Alter/Amend Judgment (Doc. No. 196) ("Defendant's Motion"), filed with a supporting Memorandum (Doc. No. 196-1). Plaintiff Equal Employment Opportunity Commission ("Plaintiff" or "EEOC") filed a Response in Opposition (Doc. No. 213) with supporting Memorandum (Doc. No. 214). Intervenor-Plaintiff Carlota Freeman ("Freeman") filed a Response in Opposition as well (Doc. No. 215). Defendant subsequently moved for the Court's Leave to File a Reply Brief (Doc. No. 219) with its Reply attached (Doc. No. 219-1). Defendant's Motion for Leave to File Reply is hereby **GRANTED**.

For the reasons stated herein, the Court hereby **DENIES** Defendant's Motion to Alter/Amend Judgment.

-1-

## I. BACKGROUND

This case is a Title VII and 42 U.S.C. § 1981 action for race and sex harassment brought against Defendant by Plaintiff and Freeman (collectively, "Plaintiffs"). A bench trial was held before this Court on February 24-27, 2009. The Court issued a memorandum order on December 21, 2009, finding that Plaintiffs met their burden of persuasion and entering judgment in favor of Plaintiffs. (Doc. No. 194.) Judgment was entered for Freeman in the amount of $1,073,261. *Id.* at 30. The Court awarded Freeman $773,261 in front pay and back pay, and $300,000 (the statutory cap) in compensatory damages under Title VII. *Id.* at 29-30. Defendant subsequently moved to alter and/or amend the judgment of the Court on January 15, 2010 (Doc. No. 196).

## II. STANDARD OF REVIEW

Rule 59(a)(2) of the Federal Rules of Civil Procedure provides:

> (2) Further Action After a Nonjury Trial. After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.

Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after entry of the judgment." A motion under Rule 59 to alter or amend a judgment should be granted to correct a clear error of law or to correct a manifest injustice. *See Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 474 (6th Cir. 2009); *Cline v. 1298423 Ont. Ltd.*, 129 Fed. App'x 208, 210 (6th Cir. 2005); *U.S. Fire Ins. Co. v. City of Warren*, 87 Fed. App'x 485, 493 (6th Cir. 2003); *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005).

## III.  DISCUSSION

Defendant requests that the Court alter or amend the Judgment to reflect an amount of equitable front and/or back pay damages not greater than $116,976.00, and that any further damages, inclusive of lost future earnings and/or emotional damages, be capped at $300,000.00. (Doc. No. 196 at 1.)

Defendant argues that "there are three errors" which warrant alteration or amendment per Rule 59.  The first is that the Court included the lost benefit estimates of Freeman's expert, Dr. Mark Cohen, in awarding damages to Freeman "which the Court suggested it would not do in its decision denying Defendant's Motion to Strike." (Doc. No. 196-1 at 2.)  Second, "[i]n its decision to credit Dr. Cohen's report, the Court was mistaken in its opinion that Dr. Cohen had properly disclosed all of the information upon which he relied prior to trial." *Id.*  Third, the Court "awarded front and back pay without considering the fact that the plant where [Freeman] worked had closed on August 15, 2008 (an issue which the Court indicated was appropriately addressed in a final disposition of the case)." *Id.*  The Court will address these arguments in turn.

### A.  Dr. Cohen's lost benefit estimates

Defendant argues that the front and back pay damages awarded by the Court include $158,586.00 in alleged lost benefits suggested by Dr. Cohen.  However, Defendant argues that in its earlier Motion to Strike Dr. Cohen's Report (Doc. No. 182), Defendant pointed out that Dr. Cohen "had erroneously based his estimate of lost benefits on the *cost* of those benefits to Defendant rather than the *value* of those benefits to the Plaintiff." (Doc. No. 196-1 at 2-3.)  Defendant argued, then and now, that the Sixth Circuit has rejected this approach as "clearly erroneous," citing *Sweeney v. American Steamship Co.*, 491 F.2d 1085, 1090 (6th Cir. 1974).  In the Court's Order on

-3-

Defendant's Motion to Strike (Doc. No. 192), the Court stated:

> The Court asserts no conclusion here as to whether Dr. Cohen's calculation of lost benefits was legal error. For present purposes, the Court finds that Defendant's argument on this issue suggests reason for the Court to disregard Dr. Cohen's lost benefit estimates in any ultimate award of damages . . . .

*Id.* at 21. Defendant argues that the Court did not return to this issue when it decided the amount of damages in the Judgment to be awarded to Freeman, but rather "simply adopted the maximum amount suggested by Dr. Cohen (which included the lost benefit estimates) without further explanation." (Doc. No. 196-1 at 3.) Defendant therefore requests that the Court reduce the award to Freeman by "the amount attributable to Dr. Cohen's lost benefits estimates—$158,586.00." *Id.*

In its Response, the EEOC argued that *Sweeney*, "the only case cited by Defendant" in support of its argument regarding the method of calculating lost benefits to Freeman, "is eminently distinguishable from the instant case and holds neither that the methodology used by Dr. Cohen to calculate the value of Freeman's fringe benefits was improper, nor that it is appropriate to not award a plaintiff the value of her fringe benefits simply because they were not calculated by the proper method." (Doc. No. 214 at 1-2.) The EEOC argues that Dr. Cohen "did not base his calculation of the value of Freeman's benefits upon what it would have cost to provide Defendant [sic][,]" but rather upon statistical information from the Bureau of Labor Statistics. *Id.* at 7.

Further, EEOC argues that *Sweeney* "does not hold that it is improper to calculate the value of benefits to an employee based on the average increase such benefits add to the labor costs of a large number of surveyed employers (Dr. Cohen's method), nor does it hold that a plaintiff" should be denied an award for those lost benefits if the method the Court employs to calculate them is incorrect. *Id.* The EEOC argues that *Sweeney* held "that it was improper to base a calculation of the value of a deceased employee's spouse's survivor benefits on what the employer would have

-4-

spent on fringe benefits for the deceased employee himself over the remainder of his work-life expectancy" and that the proper "remedy for the district's court" use of an incorrect method for this calculation "was simply to recalculate the value using a proper method." *Id.* at 8. Finally, the EEOC argues that Defendant has not cited any case for the proposition that basing a calculation of the value of Freeman's lost benefits "upon the amount that Defendant would have paid for them will not produce a reasonably certain calculation[,]" and suggests that, "considering that pension funds consist in large part of earnings on the employer's contributions after they are paid into the fund," the value of Freeman's lost benefits may have been greater than what Defendant would have paid to provide them. *Id.*

Freeman argues, also, that Dr. Cohen did not "simply add[] the actual cost to Whirlpool of Plaintiff's benefits[.]" (Doc. No. 215 at 2.) Rather, Dr. Cohen did not have access to the actual benefits costs to Defendant, and "relied upon government data from the Bureau of Labor Statistics," which indicated that fringe benefits rates are estimated to be 25.8% for all workers in the United States.

In *Sweeney*, the Sixth Circuit stated that in computing damages for loss of a decedent's future earnings, the District Court was incorrect to include "sums payable by the defendant for fringe benefits." *Sweeney*, 491 F.2d at 1090. The Court went on to state that the decedent's wife "[was] entitled to claim that percentage of his pension and other benefits that she would have received had he lived to his full work-life expectancy, not what his employer would have paid into the plans." *Id.*

In another Sixth Circuit case, *Hance v. Norfolk Southern Railway Company*, a defendant argued that "damages for fringe benefits should be calculated based on actual costs incurred by [the

-5-

plaintiff] in securing substitute benefits, not the open-market value of providing those benefits." 571 F.3d 511, 522 (6th Cir. 2009). While not squarely the same issue as that presented here, the court took the opportunity to address the proper method of calculating damages for lost fringe benefits. The court noted a past case in which it approved "an award of damages for lost medical benefits by a successful Title VII plaintiff based on medical expenses actually incurred that would have been covered by the company's medical plan" (citing *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 841 (6th Cir. 1994). *Hance*, 571 F.3d at 522. It then recognized "that a circuit split has developed regarding the issue of how to calculate such benefits," *see Tolan v. Levi Strauss & Co.*, 867 F.2d 467, 470 (8th Cir. 1989) (noting that the Fourth Circuit has awarded damages based on the value of the policy, while the Seventh and Ninth Circuits award damages based on the costs of substitute insurance coverage or actual costs expended in securing medical care). *Hance*, 571 F.3d at 522. The court subsequently held that "the district court abused its discretion in awarding [the plaintiff] benefits based on the cost of fringe benefits to [the defendant]." *Id.* The court then remanded the case to the district court to determine the appropriate damages for the loss of fringe benefits. *Id.*

However, damages in a Title VII case "need not be proven with the exactitude of lost profits in a breach of contract case[.]" *Id.* at 520. While such an award cannot be "appropriately founded on mere speculation[,]" "absolute accuracy in the calculation of damages is not necessary either." *Id.* While "the plaintiff bears the burden of proving damages," she "is entitled to the amount claimed unless the defendant can prove otherwise." *Id.* at 519.

Defendant has not put forth any evidence of which this Court is aware to rebut the notion that the cost of providing such fringe benefits to Freeman (either an exact cost or an estimated cost)

-6-

is not reasonably similar to the value of such benefits to Freeman. Nor has Defendant put forth any evidence to establish what, in fact, the value of such benefits would have been to Freeman. In the cases discussed above, the proper remedy ordered by the Sixth Circuit was not to excise the award of damages for lost benefits altogether, but rather to remand to the district court to determine an appropriate amount of damages for such benefits. *See* Hance, 571 F.3d at 522. In light, also, of the EEOC's argument that the value may actually be greater than the cost to Defendant (again, either an exact cost or an estimated cost), the Court declines to modify its judgment in this regard, and Defendant's Motion as to Dr. Cohen's lost benefit estimates is **DENIED**.

### B. *Dr. Cohen's disclosure of sources of information*

Defendant next argues that the Court cited the wrong information when it found that Defendant had not been harmed by Dr. Cohen's failure to disclose the sources of his information with regard to whether Freeman's lost wages would have been impacted by the closure of the Whirlpool plant where she worked. (Doc. No. 196-1 at 3.) In its Motion to Strike (Doc. No. 182), Defendant argued that Dr. Cohen's report and testimony should be stricken pursuant to Federal Rule of Civil Procedure 37(c)(1) because his report was incomplete under Rule 26(a)(2)(b). (Doc. No. 182 at 2.) Defendant argues that "Dr. Cohen testified at trial that he made no adjustment to his opinion of damages in light of the closing of the facility where Plaintiff had worked for over 20 years." *Id.* Dr. Cohen testified as follows:

> Q: You mentioned your consideration of the local labor market when you were giving an answer regarding Ms. Freeman's employability after the Whirlpool plant would have closed. You didn't do any significant research on the local employment opportunities Ms. Freeman would have had, did you?
>
> A: Well, I did adequate research. I did what I thought was appropriate.
>
> Q: What did you do?

-7-

> A: Well, I looked up local labor markets and looked up the Tennessee Department of Labor—I always forget the exact name of it, but the state government labor office, and looked at the data. Looked at local newspaper reports. And as, you know, a business school professor at Vanderbilt for 22 years, I follow the local labor markets and know the situation. But in this case, I did do a quick sort of update of my knowledge and looked to see what was happening in that area and what was happening overall. But that doesn't require much work on my part because again I generally keep up with this.
>
> Q: None of that data appears in your report anywhere, does it? The local labor market information?
>
> A: No, I just provided my opinion as to what her work life would be, and it wasn't relevant. Again, if I had adjusted things, that would have been something I would have sat down and explained in my report, but no, I didn't.

(Doc. No. 172 at 78-79.) In the Court's denial of Defendant's Motion to Strike, it found that any failure to disclose on the part of Dr. Cohen was harmless. (Doc. No. 192 at 15-17.) The Court found that Dr. Cohen relied on an article he found on the internet "describing the Rutherford County labor market" and that this article was made an exhibit to Dr. Cohen's deposition. *Id.* at 16. Therefore, the Court found that Defendant "suffered no prejudice" because it had from September 9, 2008 until February 26, 2009 to prepare to cross-examine Dr. Cohen "on the issue of the Rutherford County labor market." *Id.* at 16-17.

In its instant Motion, Defendant argues that it "did not argue that this article represented the information which Dr. Cohen had failed to disclose. Rather, . . . it was the data which Dr. Cohen had apparently obtained from a state government source that Dr. Cohen had never identified until trial." (Doc. No. 196-1 at 4.) Defendant argues that it has not shown how it was harmed because it had no way of testing Dr. Cohen's statement that "it wasn't relevant" without first having examined the data in question. (Doc. No. 219-1 at 4.) While the EEOC states that "the article cited in Dr. Cohen's deposition had referred to a Rutherford County Chamber of Commerce opinion on worker

-8-

displacement," Defendant argues that "at trial, Dr. Cohen referenced *state*, not county, data, and there is no indication that the Rutherford County Chamber of Commerce opinion was in any way related." *Id.* at 5 n.1.

Judging from the testimony of Dr. Cohen at trial, the Court declines to find that Dr. Cohen necessarily consulted sources other than those disclosed at his deposition in order to assess the state of the labor market in Rutherford County. As noted above, Dr. Cohen stated that he "always forget[s] the exact name of it," and did not state with specificity that he consulted specific statistics from governmental sources in addition to the materials already discussed. The Court declines to find that its earlier denial of Defendant's Motion to Strike on the grounds that any failure to disclose by Dr. Cohen in his report represents harmless error, constitutes "a clear error of law" or a "manifest injustice." Accordingly, Defendant's Motion with regard to Dr. Cohen's expert disclosure is **DENIED**.

### C.    *Front and back pay*

Defendant argues that the $773,261.00 awarded to Freeman in the Court's Memorandum Order as front and back pay "far exceeds any amount of front or back pay to which [Freeman] was entitled as a matter of law." (Doc. No. 196-1 at 5.) Defendant states that the Court's Judgment "incorrectly combines front or back pay and lost future earnings into a $773,261.00 award of equitable damages (while concurrently awarding the full $300,000.00 in available compensatory damages)." *Id.* Defendant argues, citing *Williams v. Pharmacia*, 137 F.3d 944, 953-54 (7th Cir. 1998), that "front pay" constitutes an equitable remedy separate from the compensatory remedy of lost future earnings. *Id.* "Front pay," it claims, is "encompassed under the statutory language authorizing 'any other equitable relief' and is the 'functional equivalent of reinstatement because it

is a substitute remedy that affords the plaintiff the same benefit (or as close an approximation as possible) as the plaintiff would have received had she been reinstated.'" *Id.* (citing *Williams*, 137 F.3d at 953-54). Defendant argues, however, that where an intervening and unrelated circumstance, such as a plant closing, establishes that the plaintiff would have been terminated regardless of any alleged wrongdoing, "back and front pay are not available after the date of that intervening circumstance." (Doc. No. 196-1 at 5.)

In *Schrand v. Federal Pacific Electric Company*, 851 F.2d 152, 158-59 (6th Cir. 1988), the Sixth Circuit found no abuse of discretion where the district court concluded that "even if [the plaintiff] had not been wrongfully terminated in October 1983, he would have been terminated for a nondiscriminatory reason on August 31, 1984, when the office permanently closed." *Schrand*, 851 F.2d at 159. The district court also found that the "jury impliedly found that the plaintiff would have been terminated when the office permanently closed" and "held that [the plaintiff] was not entitled to any further damages in the form of front pay or reinstatement." *Id.* Defendant cites other cases from other circuits in support of the proposition that district courts do not abuse their discretion when they limit front pay to the time up until the plaintiff would have been terminated for unrelated legitimate reasons. (Doc. No. 196-1 at 5-6 (citing *Williams*, 137 F.3d at 953; *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1350 (11th Cir. 2000); *Rodriguez et al. v. Caribbean Forms Manuf. et al.*, 399 F.3d 52 (1st Cir. 2005)).) Defendant states that "any front or back-pay award to [Freeman] should have been cut off as of the date the plant closed (August 15, 2008)[,]" but that the Judgment, "in clear error, awards pay damages through the end of Plaintiff's alleged expected work life." (Doc. No. 196-1 at 6-7.)

In its Memorandum Order, the Court noted that front pay—"simply money awarded for lost

-10-

compensation during the period between judgment and reinstatement or in lieu of reinstatement"— was not subject to the compensatory damages cap of Title VII. (Doc. No. 194 at 23 (citing *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001).) The Court also noted that "front pay is appropriate where reinstatement is not an option, due to 'continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by plaintiff as a result of the discrimination.'" (Doc. No. 194 at 23 (citing *Pollard*, 532 U.S. at 846).) The Court found a constructive discharge of Freeman by Defendant (Doc. No. 194 at 25-28), and found that "[a]s a result of . . . harassment and the assault, Freeman suffers from chronic post-traumatic stress disorder rendering her unable to work," *id.* at 29. The Court therefore found that "reinstatement was . . . not an option, nor was any other work feasible to mitigate damages" and awarded Freeman front pay and back pay in the amount of $773,261.00, in accordance with the calculations of Dr. Cohen as to Freeman's work life and income expectancy. *Id.* The Court then awarded $300,000.00 in compensatory damages for emotional injuries suffered by Freeman. *Id.* at 29-30.

Defendant argues that the proposition that front pay is available to Freeman because of the psychological injuries she suffered as a result of the discrimination which prevent her from working "presupposes . . . that there is a job to go back to. . . . [W]here there is no job (indeed, no place of employment in the present case) to return to, front or back pay is not the appropriate remedy . . . ." (Doc. No. 196-1 at 7 n.2.) Defendant contrasts *Pollard*, where "the plaintiff . . . did not return to work because of the presence of the same hostile work environment, not because the place of employment had closed," 532 U.S. at 845, with *Williams*, "where, despite the continuing damage to the plaintiff's ability to earn a living, the [district] court cut off front and back pay at the point where the plaintiff could no longer have been employed [by the defendant,]" 137 F.3d at 952-53.

-11-

(Doc. No. 196-1 at 7 n.2.) Defendant argues that any damages beyond August 15, 2008 resulting from Freeman's inability to work are "properly characterized as 'lost future earnings,'" which the *Williams* court rules are a form of compensatory damages and subject to the $300,000 statutory cap. *Id.* at 7.

The EEOC notes in its Response that both of the decisions (namely, *Schrand* and *Williams*) cited by Defendant in support of its argument that an event like a plant closure demarcates the difference between front pay and lost future earnings (and the difference between an uncapped equitable remedy and a capped compensatory-damages remedy) only establish that it was no abuse of discretion for a district court to so hold. (Doc. No. 214 at 10.) Defendant has not, it argues, cited any case that has held that it was an abuse of discretion for a district court to decline to cut off front pay at the date of an event like a plant closure or a merger. *Id.* It argues that to accept Defendant's argument is to find that "all of the factors" that "are to be considered in determining what amount of front pay is required to make whole a victim of discrimination" "are moot when a plant closing is involved." *Id.* The EEOC also notes that no case Defendant has cited "involve[s a] situation[] where a plaintiff was totally incapacitated from working for life because of the employer's discrimination." *Id.*

Freeman, in her Response, also distinguishes *Williams* on the grounds that the plaintiff in *Williams* was "able to return to work"; on the contrary, Defendant here "caused the unemployability" of Freeman. (Doc. No. 215 at 4.) Freeman cites *Munoz* for the proposition that the Court "enjoys 'wide discretion' in the formulation of an award of front pay." *Id.* at 5 (citing *Munoz*, 223 F.3d at 1349).

In *Munoz*, the defendant argued that the plaintiff was "ineligible to receive front pay

-12-

because, even had [the plaintiff] not been terminated in 1995, he nonetheless would not have been employed by the Resort at the time of trial[,]" since "sometime after [the plaintiff] was terminated, the Resort eliminated its room services and, accordingly, all room server positions." *Munoz*, 223 F.3d at 1350. The Eleventh Circuit subsequently found that the defendant did not satisfy its burden of proof that it actually "would have terminated the plaintiff rather than reassign him to some other position" when it "demonstrat[ed] only that it eliminated the plaintiff's former position." *Id.* The court found that, while "the elimination of [the plaintiff's] former position certainly is a valid consideration in the resolution of this issue, it does not compel the more critical conclusion that the Resort would not have employed [the plaintiff] at the time of trial. The Resort failed to introduce any evidence demonstrating either that [the plaintiff] was unqualified for another available position or that, for some other reason, reassignment would have been infeasible." *Id.* at 1350-51. The court noted that while "the Resort intimates that it eliminated several positions when it discontinued its room services, the record does not reveal whether the Resort actually terminated the other room service employees. If the Resort reassigned them, then presumably [the plaintiff] would have been afforded this same opportunity had he not been discharged" for discriminatory reasons. *Id.* at 1350 n.16.

Freeman argues that, under the approach adopted by the Eleventh Circuit in *Munoz*, the Court should require Defendant to "demonstrate with particularity that it actually would have terminated the plaintiff," thereby ensuring that "equitable relief is not foreclosed lightly." (Doc. No. 215 at 5-6.) Freeman argues that "Defendant only offered limited testimony that one plant had closed. There was no evidence produced by Defendant that Plaintiff was not eligible for re-assignment" elsewhere, at "any number of plants or facilities at another location." *Id.* at 6.

-13-

Defendant argues that *Munoz* is distinguishable, because the employer in that case "simply eliminated the plaintiff's position; it did not close the plaintiff's place of employment." (Doc. No. 219-1 at 7.) Defendant argues that while in *Munoz* there were other positions available and there was no evidence that the plaintiff would have been unqualified for those jobs, here Defendant "closed [Freeman's] place of employment entirely, and there is no dispute that *no* positions of employment remained after August 15, 2008." *Id.* Defendant argues that Freeman has "offered no evidence about the existence of any Whirlpool plants . . . where she thought she could work; that Whirlpool provided any such opportunities to any terminated employees at LaVergne; or that Whirlpool was obligated in any way to reassign terminated employees . . . ." *Id.* It further argues that Freeman "offered no evidence that she would have been willing to relocate" to work at such other plants." *Id.*

The Court does not find Defendant's distinction between *Munoz* and the instant case apt. The Court notes that it was incumbent on the defendant in *Munoz* rather than upon the plaintiff to demonstrate that the defendant would not or could not have reassigned the plaintiff; Defendant's repeated arguments regarding Freeman's failure to "offer . . . evidence" therefore are unconvincing. Defendant is the party with the burden of persuasion, not Plaintiffs. While it is undisputed that the La Vergne plant in this case closed on August 15, 2008, there is no allegation that Whirlpool itself has gone out of business or has ceased employing people in its manufacturing plants.

In *Schrand*, the Sixth Circuit upheld the district court's decision to limit front pay after a jury award that implied that the jury found that the plaintiff would have been terminated when the office permanently closed. 851 F.2d at 159. In the instant case, there was no such finding made by the finder of fact. The Court also notes that "front pay is a remedy available to the trial court for

-14-

use, in its discretion, in fashioning relief," *id.* at 158, and that victims of discrimination should be "ma[de] whole"; that is, restored "so far as possible to a position where they would have been were it not for the unlawful discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975).

Given the approach approved by the Eleventh Circuit in *Munoz*, and the lack of a clear statement from the Sixth Circuit about whether a failure by the district court to cut off front pay upon a plant closure (or similar event) constitutes an abuse of the district court's "wide discretion" to make whole the victim of unlawful discrimination, the Court declines to find that failing to so cut off the award of front pay to Freeman constitutes a "clear error of law" or a "manifest injustice." Defendant's Motion as to back and front pay is accordingly **DENIED**.

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that Defendant has not offered to the Court sufficient evidence that the Court's Memorandum Order contained clear errors of law or manifest injustices. Accordingly, Defendant's Motion to Alter/Amend Judgment is **DENIED**.

It is so ORDERED.

Entered this__31st_____day of March, 2011.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT